Ready to proceed on, um, now we have McCray. I please the court, my name is Richard Hagstrom and I'm here representing the plaintiffs in the Delaware Title Action and I would like to reserve five minutes for rebuttal. Mr. Hagstrom, help me with something. Mr. De Palma started out, I know you're not bound by what he said, but uh, suggesting that the New Jersey case was so easy because of the regulatory scheme in New Jersey. When I read your brief, I thought the Delaware, to the extent that it may apply at all, was a much easier case because no affirmative approval is required. The rates become effective unless the Commissioner of Banking, I guess it is, acts to reject them, they become effective, which seems like a stronger argument for your side than the New Jersey scheme. Am I missing something? I don't believe so, Your Honor. This is a file in use state and we have to look at not only the statutes, which is a file in use, but also bulletin number five that's part of the record. That goes back to August of 1990. And in that bulletin, the Commissioner of Insurance notified all insurers, including title insurers, that you are henceforward to file rates independently, act independently. These defendants could have followed that directive. They should have followed that directive. They made their own choice to jointly get together, contrary to the bulletin, contrary to the statute, and jointly file. And obviously the reason that's important is if each defendant had acted independently, as bulletin five requires, we wouldn't be here. I'm not so sure about that. Well, no, I... The argument may be different, but my guess is we'd still be sitting here. No, seriously, if they had filed independently, came to their own independent decisions, that means there's competition and we wouldn't have been here. So nevertheless, they acted contrary to the statute, contrary to bulletin five. Why didn't the Commissioner reject the rates? He's got 30 days, I guess, to reject them? I can't answer for the Commissioner. It's a file in use state. There's 30 days for the Commissioner to act, and it's the effect of if the Commissioner doesn't act, it's non-disapproval. Did you file anything with the Commission on behalf of your clients pointing this out at the time? No, we did not, Justice O'Connor. That occurred back in 2004 is when that rate filing occurred. Yes. And quite frankly, we weren't aware of it. I mean, there's no public notice that there's a filing going on. And the problem with title insurance is that consumers, businesses, and so forth, really their first interaction with the title product is at a closing. I mean, people aren't out there shopping for title insurance, and that's why competition in this business is so absolutely essential. But they chose not to compete. Other insurers compete. You see their advertisements on TV. You don't see advertisements with title insurers. People would sleep through them. You're not commenting about this, right? They make some pretty creative ads like for all state and so forth. The guy, I forget what he calls himself. But I'm sure title insurers might be able to come up with something like that. It might be a little more boring. But it probably would be boring for this reason. And this kind of skips to the McCarran-Ferguson Act. We talk about what does it mean to have the business of insurance? What is an insurance policy? The typical issue for insurance is risk. And risk refers to the risk of a future contingent fortuitous event. That's the Lipschitz testimony, but that's a kind of risk. But it's clearly not the only kind of risk. Why can't you buy insurance against something that may have happened in the past that would cause you harm in the present or future if you don't know about it having happened? That's a risk that I want to guard against. Okay. That's a defect. I believe that's a defect. Just like you have if you go out and buy a new car, defect causes me to be put off my property, not my home. That defect is putting me at risk to my home that I just thought I owned. But with your home, if there's a defect, for instance, in construction, that's a defect based upon a home warranty then, that you're going to pursue under a home warranty. I'm not talking about that defect. I'm talking about the defect in title. Somebody didn't record. I have no way of knowing about it. All right. The Indians. Pardon me? The danger that it really goes all the way back to the Indians. I mean, isn't that what your friend was talking about before with respect to New Jersey? I'm sorry. I missed the first part. The ownership really would be in Indians who want to build a casino. Okay. Isn't that what's happening nowadays? Well, but that, again, is a defect in the title. That's not some fortuitous event. They could have discovered it. They don't warrant against identified defects in title. They provide payments for unidentified defects in title. Well, but, I mean, if they didn't know that there had been Indians, that there had been an Indian treaty all the way back, isn't that really what they're looking to insure against? Well, I disagree, Your Honor.  It was a question. And I believe what the response to that is, that they are warranting the effect of their title search going back in history, and they didn't find something. So, therefore, they pay under their warranty. This is not a casualty loss. And also addressing the business of insurance, the three Perino factors, the last one being, is this unique to insurance? Is this activity unique to insurance? Well, one could look to the proliferation of escrow companies, title companies, and attorneys do title opinions. But in your complaint, there's no allegation about anyone outside of the immediate relationship being involved. You make that argument factually, but your complaint is really narrowed to the persons involved in the insurance, if you want to call it that, the insurance relationship. Well, that's the Perino 2 factor, if I'm understanding, Your Honor. I'm referring to the third factor. I thought I was, too. Well, the third factor, as I understand it, refers to is the activity unique to an insurer. And the point is, it isn't. Attorneys do title opinions. You could look to Goldfarb v. State of Virginia, where there was a minimum fee schedule, and the Supreme Court held, number one, even though there's the state bar involved, you cannot get together and set these minimum prices. And certainly if the… You just shifted gears on me. I thought you were talking about the third Perino factor. I am. And now you're talking about collusion. But the fact is that the attorneys get together. They fix their prices. One certainly wouldn't call that the business of insurance. It's no different here. There's other entities that do title searches, do escrow exams, et cetera. So it's not insurance for that reason. We go to the risk factor, the Perino 1 factor, and there, as Mr. DePalma mentioned, there's no spreading of risk. The activity was that price fix. I really did miss that point. Why isn't there spreading of risk? I think we all agree the risk is very slight. It's not as big as the risk one undertakes when you get into an automobile and you drive on the school expressway, for example. But there is some risk. And to the extent that if I become victimized by my title being defective, I'm paid or reimbursed the cost of that property that I thought I owned. And that cost, coming back to me, is going to be spread amongst all the people who buy title policies from that company. Why isn't that spreading of risk? However minimal the risk may be, the company is not on the hook for that. It's going to be dispersed to all the people who are policyholders. And I'd suggest that that risk, and the district court referred to that as a reason why it is the business of insurance. I submit that that risk is inherent solely to that individual company's title search. There's not a spreading of that risk among insurers. There's not a spreading of that risk among policyholders. And one only needs to look at Bulletin 20. I don't understand. I don't understand that. Let's assume that there's a catastrophe and there's a series of fraudulent advances and one company is on the hook for all of the bad purchases. And they pay out all of those claims. You're saying that that company would not reimburse itself or seek to continue in business by building in that loss to the amount of its premiums it's going to charge down the road and that every policyholder who buys from that company is not going to, to some extent, be on the hook for all those bad titles? Let me cut to the chase on that. Bulletin 27 exempted these insurers from filing lost costs. And the reason they said they did that was because there was not enough of a history. Right, but the inference to be drawn from that is that these are not lost costs. There are no lost costs for title insurers in the sense of true business of insurance. And, in fact, the commissioner in the bulletin said, due to the unique nature of title insurance, we're going to grant this exemption. So I believe the inference to be drawn from that is that there is not risk spreading. There are not lost costs filed. But you admit it in the complaints. Don't you admit that there's some risk spreading? That's the defect part that's inherent only to that particular contract. I don't understand that. Well, I apologize, Your Honor. I'd like to address the filed rate doctrine momentarily. We've made a claim for injunctive relief, and the district court dismissed that as well. What jurisdictions, what other jurisdictions have adopted the position that you have and can be used as precedent in terms of the ---- Saying the filed rate doctrine doesn't prohibit this. Well, other jurisdictions would be the Ninth Circuit and Brown. That's the only one I know. What else? I think that's it. That's pretty poor, weak precedent. It's just one case. Well, it's one case, but there's two aspects to this. Okay, on injunctive relief, we're seeking an end to the conspiracy, and that's clearly a Supreme Court precedent, Georgia v. Pennsylvania Railroad. It doesn't affect the current rate because we're not challenging that current rate. So under that precedent, you know, we should be able to pursue injunctive relief. Now, getting back to the filed rate doctrine, generally on the damages side, I understand that Brown v. Tycor is, you know, the one exception. But here we've got a situation, as I mentioned earlier, that the ---- defendants chose to act collusively contrary to the statute. So their filing was invalid in our sense. It was also invalid in the sense that the statute requires, Section 2504 requires that lost cost data be filed with the filing. Were they excused from that by another bulletin? Bulletin 27 says that, but the problem, Your Honor, is that you can look to the very cases that the district court agreed with our position on, and you can also add Maislin Industries to that. It's a 1990 U.S. Supreme Court decision. And in that particular case, there was an issue about the negotiated rates rulemaking of the ICC. A trustee in bankruptcy for the carrier sued to get the higher tariff rate as opposed to the lower negotiated rate. The Supreme Court held that those negotiated rate rulemaking was invalid. Therefore, the contract rate didn't apply. Was that one of the price squeeze cases? No, that wasn't a price squeeze. But the point here is that the statute requires the filing of the data supporting the rate. My point is, using Maislin Industries, that it's improper for the commissioner then to excuse what the statute requires. I thought what the commissioner excused was the data backing up the filed rate. Exactly, and that's what the statute requires. Thank you very much. Your time is up, and we'll hear from you on rebuttal. Mr. Ostrader? Thank you. May it please the Court, I'm Barry Ostrader from Simpson Thatcher in Bartlett, and I'll be arguing on behalf of the title insurers on the McRae case. The appellants in this case are complaining about the... Could you speak up a little bit? Just speak up a little bit. Thank you, Your Honor. The appellants in this case are complaining about the fact that the title insurers are doing precisely what Delaware law requires them to do. Delaware has a statutory scheme which was enacted allowing title insurers to work through the Delaware Title Insurance Rating Bureau to submit and file rates with the Delaware Insurance Commissioner, and the Delaware Insurance Commissioner determines that rates are not excessive, inadequate, or unfairly discriminatory. But I think they're saying that the filed rate doctrine shouldn't apply or doesn't apply where the rates are obtained through misrepresentation or fraud, and they say there's been misrepresentation or fraud here. What is your answer to that? My answer to that is that there is no fraud exception to the filed rate... So even if there's misrepresentation or fraud, the filed rate doctrine applies and they're out of luck. That's what this Court said in the AT&T decision, and that's what the Second Circuit said in the Wagoland decision. The filed rate doctrine has a long history in the United States Supreme Court and in the various circuit courts of appeal. First recognized in Keogh, reaffirmed in Square D, and I should point out that the only circuit court of appeal decision that ever questioned whether meaningful review was required by a regulatory agency was the Brown v. Tycor case, which was issued six years after the Square D decision and ignored the Square D decision. Subsequently, the Ninth Circuit in the Wa-Chang decision in 2007 implicitly disapproved of the Brown v. Tycor decision because the Ninth Circuit held that no meaningful review was required in order to apply the filed rate doctrine. The Square D has been followed and applied by this Court, both in the AT&T and Ultimax decisions, by the Taffert case in the Eleventh Circuit, by the Dolan case on almost precisely identical facts, by the Second Circuit in 2010, and also by the Winn case in the Fifth Circuit, also in 2010. Is there anything that appellants could do if their allegations are true that the rates were obtained as a result of fraud or misrepresentation? Yes. What can they do? The Delaware statutory scheme specifically provides that if any policyholder has any questions with respect to the decisions of the Delaware Office of Insurance, they can file a complaint with the Delaware Office of Insurance. They're entitled to a hearing. They'll get a determination. Was any complaint filed here? No, there was not. No, there was not. Do you know why? I do not know why no complaint was filed. Apparently, these plaintiffs wanted to proceed in federal court and have a federal court interfere with the state regulatory scheme, which is something that the United States Supreme Court has explicitly held federal courts should not be doing. He's arguing that the companies in Delaware didn't really follow the regulatory scheme because there's a violation of the statute by the commissioner. That's simply demonstrably incorrect. The Bulletin 27 explicitly says that these rates are to be filed, that the Delaware Office of Insurance is going to hire an outside actuarial firm to review rate filings, and it specifically says that the title insurers may, if they choose, file loss cost information, which in this case the title insurers did do, which is reflected in the joint appendix at pages 353 to 59, which exhibits B through D of the motion to dismiss in this case. So what we have here is scrupulous adherence to the Delaware statutory scheme. Any aggrieved party had a remedy with the Department of Insurance. The Delaware statutory scheme even provides that if they're dissatisfied with the ruling of the Delaware Office of Insurance with respect to any grievance they have, they can appeal that to the Delaware Chancery Court. So there's a seamless statutory scheme that enables anybody who has a problem with the filed rate to take action. But the action that they can't take under controlling Supreme Court precedent on the filed rate doctrine and the law of this circuit is they can't come into federal court and ask the federal court to be involved in deciding whether rates approved by the Delaware Office of Insurance are fair and reasonable. And that's a position that more than a half a dozen circuit courts of appeal have consistently adhered to. There is no case other than this Brown case, which I indicated was essentially implicitly overruled by the Wah Chang case by the Ninth Circuit that permits a challenge under the filed rate doctrine. And in the Supreme Court jurisprudence, specifically in Square D, the Supreme Court said whenever tariffs have been filed, and that's not limited to where the agency... I'm sorry, whenever tariffs have been filed? That means a rate, a filed rate. No, I understand what the word means. I just didn't hear it. I apologize. I do speak softly and I apologize for that. Well, don't speak softly here because we need to hear you. Thank you, Your Honor. The Square D case squarely holds that it's not even necessary for a regulatory agency to investigate rates that are filed. And that's consistent with what the Supreme Court said in the Montana-Dakota Utilities case where it said parties can claim no rate as a legal right that is other than the filed rate, whether fixed or merely accepted by the regulatory body. That's a 50-year-old United States Supreme Court case, which of course was followed in Square D. So insofar as the filed rate doctrine is concerned, I think this Court in colloquy with the New Jersey appellants had it exactly right. Stare decisis requires that where a filed rate exists, there is no federal remedy. And this is not an antitrust immunity. This is not an antitrust exemption. This is simply a limitation of remedy available in the federal court. There are remedies available in the Delaware State statutory scheme. There are further remedies available in the Delaware State court system if an aggrieved party is dissatisfied with the remedy that it seeks before the Delaware Insurance Commission. So I don't think that these cases are well-founded. I think the district court had it exactly right. The filed rate doctrine bars this case. And one other thing that's very important here, in this record there's only one rate filing that was made by the Delaware Title Insurance Rating Bureau with the Delaware Office of Insurance. That was in 2004. That's the only rate filing that's been made that's part of this record. And that's been in place for the last eight years. Anybody who had any problem with that could have gone to the Delaware Office of Insurance, could have availed themselves of the remedies available with respect to grievances in the Delaware Insurance statutory scheme and consequently any claim of injunction would be barred because an injunction would be to prohibit the same thing. And that's precisely what the Second Circuit held in the Dolan case. According to you, then, there's no need to get into the McCarran-Ferguson Act? There is no need to get into the McCarran-Ferguson Act because I think the filed rate doctrine is dispositive. If the court were inclined to get into the McCarran-Ferguson Act, we have this court's opinion in In Re Insurance Brokerage, which is a 2010 decision, where this court said that the primary concern of Congress was that cooperative rate-making efforts be exempt from the antitrust laws because such concerted efforts were understood to be necessary to ensure the adequate capitalization of insurance companies. And this court went on to say, it is clear that at least the following activities are the business of insurance. And that's at 618 F. Second, 355, preparing and filing a rating schedule either on behalf of an individual company or jointly through a rating bureau. So this court held in the 2010 case that I just referred you to, the In Re Insurance Brokerage case, that McCarran-Ferguson would bar any claim that sought to disapprove or challenge rate-making efforts by rating bureaus. So we have a complete bar to the prosecution of this case under the Filed Rape Doctrine, under well-settled Supreme Court precedent. We have a complete bar to the prosecution of this case under McCarran-Ferguson. I think there was reference made to whether this is insurance, and of course insurance covers any fortuitous event and it covers any unknown event. And I think, Judge Sullivan, you mentioned the case about the Indians. This goes back hundreds of years, and it was never known that such a claim could be brought. That's right, and if you bought property not knowing, and all of a sudden you'd have title insurance for that, and that's a risk. That's a risk that is insured, and I think it's quite well settled that title insurance is insurance for purposes of McCarran-Ferguson and for purposes of common sense. I think there's the national securities case in the United States Supreme Court bears on that point, and the FTC v. Tycor case explicitly says that title insurance is insurance, is an insurance product. So unless the Court has any further questions, I think I've addressed all of the issues that the appellants have raised. Thank you. Thank you very much. Thank you. I want to make something as clear as I possibly can. Bulletin 27 changed nothing about Bulletin 5's directive not to file joint rates, and these defendants chose to file those joint rates. Now, what's the effect of that here? So they're directed to file individually. They file jointly. They privately, collusively, price-fixed before filing those rates. Now they come into court and say, we want application of the filed rate doctrine here because we jointly filed rates. So what they've done is they're trying to create a shield for their activity that is in conflict with the very statute that they're filing under and contrary to Bulletin 5. And Bulletin 27, again, did not say, by the way, you can now file jointly. It did no such thing. How do we write the rule? What rule of law comes out of your argument? Because in this case, it might be a pretty straightforward situation where you've got the one bulletin and the other bulletin and there's conflict and you're arguing that the rates were filed in a manner that's inconsistent with state law. In another case, there may be a situation where the commissioner or the secretary really arguably didn't give the rates the kind of scrutiny that he or she should have brought to bear on the rates. And once we start down that road, how do we get off of it? How do we get a rule of law out of your argument that makes sense consistent with what the court has told us in the filed rate doctrine cases? I appreciate the question, Your Honor. I think in this particular case, the straight-through approach is it was an invalid filing. Which was an invalid filing? Their filing in 2004 was invalid for numerous reasons. It violated the statute. They did it jointly. And it didn't have the loss-cost data that the statute requires. Even though under Delaware law, it's an effective rate and therefore presumed, not presumed, but is determined to be fair, non-discriminatory, all those things. Well, if we want to assume all those things, but still... In Delaware law, though, because it wasn't acted upon to reject it, all those things then follow. It's an active rate. It's effective. It's fair, non-discriminatory. That's the effect of Delaware law. Well, under the file in use, it became quote-unquote effective. My point is that the application was invalid. The district court recognized, and it agreed with our cases, that if you have an invalid application, you have no filed-rate doctrine. And that's precisely what I am arguing is we have here. And so that's why I'm saying they're using the joint filing and the filed-rate doctrine as a shield to stand back and say, well, yeah, we filed contrary to the statute. We filed contrary to the bulletin. We've had these fixed prices for several years. We've reaped ill-gotten gains from those fixed prices. And, oh, by the way, filed-rate doctrine bars your claim. That is contrary to the statute, and that's not how the filed-rate doctrine was intended to be used. How is it contrary to the statute? Pardon me? If it's a filed-in-use statute, how is it contrary to it? It's contrary because they didn't file the costs. Because they didn't? And they filed the lost costs as they're required to do under the statute with their filing. But they were exempted from filing the lost costs. My point earlier is Maeslin Industries and the other cases, the statute controls over what the commissioner may do in rulemaking. The Supreme Court in Maeslin Industries overruled the ICC in its rulemaking because it was contrary to statute. That's precisely what has happened here. So it's an invalid filing. Now, the other issue going to Your Honor's question about, you know, how do we deal with, you know, where's the bright line? I submit it goes to the meaningful review test. And this case is similar to the state action exemption cases. And you look at TICOR, you look at what this court did in the TICOR case on If you don't look at the active supervision, hear meaningful review, it essentially allows the filed rate doctrine to swallow. Thank you very much. We'll take them under matter under advisement and recess.